UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| PAUL D. LOVE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 5:06-CV-085-C |
| | § | ECF |
| JO ANNE B. BARNHART, | § | |
| Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

**REPORT AND RECOMMENDATION**

Plaintiff Paul D. Love seeks judicial review of a decision of the Commissioner of Social Security, denying his applications for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB). The United States District Judge, pursuant to 28 U.S.C. § 636(b), referred this case to the United States Magistrate Judge for report and recommendation, proposed findings of fact and conclusions of law, and a proposed judgment. This court has reviewed the administrative record and the arguments of the parties under the substantial evidence standard set forth under 42 U.S.C. § 405(g) and has determined that the Commissioner's decision should be affirmed.

**I.   Statement of the Case**

Love tested positive for HIV (Human Immunodeficiency Virus) in 1996. (Tr. 374.) Prior to filing his applications for Social Security benefits he worked as a mutual fund trader and mutual fund service representative and claims he had difficulties maintaining a forty-

hour workweek. (Tr. 99.) He claims he ultimately quit working in May 2002 because of chronic fatigue, sleep episodes during the day, and depression. *Id.* He testified that he used cocaine at that time to boost his energy level, and medical records from later that year show that his physician considered him to be cocaine dependent, that he was not compliant with his HIV treatment plan, and that he had discontinued taking his HIV medications. (Tr. 152-53, 191, 637.) Love moved from Dallas to Lubbock later that year and entered a drug and alcohol treatment center in November 2002 and filed for DIB and SSI on December 16, 2002. (Tr. 91-92, 191, 380.)

Thereafter, on February 26, 2003, Love established a patient-physician relationship with Dennis Duriex, M.D., for treatment of his HIV. (Tr. 248-49.) At that time Love was taking Paxil for depression and his HIV was asymptomatic. (Tr. 249.) Throughout the remainder of 2003 and 2004 Dr. Duriex saw Love at follow-up appointments on a regular basis and consistently indicated that Love's HIV was asymptomatic. (*See, e.g.*, Tr. 228, 230, 307, 315, 313-19, 322, 326, 333, 335, 530, 535.)

Relying in part on the examination and treatment records from Dr. Duriex, the ALJ determined that Love could perform the full range of sedentary work and was therefore not disabled. (Tr. 29.) Love contests the ALJ's decision on a number of grounds. He argues the ALJ erred in failing to find that his mental illnesses were not severe; failed to consider the combined effects of all his impairments; failed to properly evaluate the opinions of treating physicians and non-treating medical examiners; and erred in assessing his credibility. He also argues that the ALJ's decision is not supported by substantial evidence and that a

2

reasonable mind would not accept the ALJ's conclusion in light of the overwhelming medical evidence which contradicts it.

## II. The ALJ's Consideration of Love's Mental Impairments

Love specifically argues that the ALJ erred in failing to find that his cognitive disorder, depression, anxiety, and obsessive compulsive disorder were not severe, that the ALJ dismissed the foregoing mental illnesses and did not find that they were severe because he found that none of them satisfied the severity of a listed impairment, and that he failed to consider the disorders in combination with his other impairments in reaching his decision.

Love's arguments do not require remand. First, contrary to Love's contention, the ALJ applied the severity standard as set forth under the Rulings and Regulations and *Stone v. Heckler*, 752 F.2d 1099, 1101-02 (5th Cir. 1985). (Tr. 26.) Under these authorities the ALJ is required to consider at step two of the sequential disability analysis[1] whether the claimant's impairments significantly limit his physical or mental ability to do basic work activities. *Id*. The ALJ is also required to rate the degree of limitation caused by the claimant's mental impairments in activities of daily living; social functioning; concentration,

---

[1] In order to determine whether an applicant is disabled, the Commissioner considers the applicant's claim under a five-step sequential analysis. 20 C.F.R. § 416.920 (2006); *see Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000). Under the sequential inquiry, the hearing officer decides whether the applicant: (1) is not working in substantial gainful activity; (2) has a severe impairment; (3) has an impairment that meets or equals a listed impairment in Appendix I of the regulations; (4) has an impairment that prevents him from doing past relevant work; and (5) has an impairment that prevents him from doing any other work. *Id*. At the fifth step of the sequential evaluation process, the burden is on the Commissioner to show that, considering the claimant's residual functional capacity, age, education, and past work experience, the claimant can perform work that exists in significant numbers in the national economy. At the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work available in the national economy. *Perez v. Barnhart*, 415 F.3d 457, 462 (5th Cir. 2005) (citation omitted). Once the Commissioner makes this finding, the burden of proof returns to the claimant to rebut the finding. *Id.*

persistence, and pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a (a),(c)(3). The degree of limitation in these areas is also relevant at step three of the sequential disability analysis. *See* 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 12.02, 12.04, 12.06, 12.08, 12.09. In this case, the ALJ made his step two determination, considering the degree of limitation caused by Love's mental impairments, in tandem with making his step three determination. (Tr. 26.) The fact that the ALJ structured his analysis in this manner does not compromise the integrity of his decision.

     The ALJ applied the correct legal standard in this case and did not err in finding that Love's mental illnesses were not severe. Although Love cites examination records from a number of physicians which he claims support a finding that he suffered from severe mental impairments, the records he cites also provide substantial evidence to support the ALJ's determination that his mental impairments were not severe. For example, Love contends evidence from Boris Porto, M.D., establishes that he had severe depression and paranoid personality traits and a guarded prognosis. The evidence Love references consists of Dr. Porto's examination notes from his initial evaluation on May 23, 2003. (Tr. 300-05.) On that date Dr. Porto diagnosed Love with dysthymic disorder, Attention Deficit/Hyperactivity Disorder (ADHD), personality disorder with dependent, passive/aggressive, paranoid, and obsessive/compulsive features. (Tr. 304.)

     Despite these diagnoses, Dr. Porto indicated that Love's mental status examination was normal and assigned Love a current Global Assessment of Functioning (GAF) score of 60 and a GAF of 70 for the prior year. (Tr. 303-04.) A GAF score is an assessment of an

individual's psychological, social, and occupational functioning based on a hypothetical continuum of mental health and mental illness.  AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 34 (4th ed. 2000) (DSM-IV). An individual assigned a GAF score of 60 could be expected to experience moderate rather than severe symptoms and/or moderate rather than severe difficulty in social, occupational, or school functioning.  *Id.*  An individual assigned a GAF score of 70 could be expected to experience mild symptoms such as depressed mood and mild insomnia.  *Id.* Dr. Porto's subsequent treatment notes demonstrate that Love, in fact, experienced only mild to moderate symptoms.  Dr. Porto prescribed psychiatric medication for Love from May 23, 2003, until March 22, 2004, and consistently noted that Love was mildly to moderately depressed and only mildly anxious and exhibited no major symptoms. (Tr.  297-305.)

Other evidence provides substantial evidentiary support for the ALJ's determination that Love's psychiatric conditions were not severe. For example, neuropsychologist Matthew E. Lambert, Ph.D., examined Love on August 5, 2004, and found no gross signs of depression or anxiety.  (Tr. 295.)  He also found that Love's speech was logical, coherent, and goal-directed; his insight was good; and his eye contact was appropriate and facial expression was pleasant.  *Id.*  Medical expert Hellmut Tauber, M.D., testified that Love did not suffer from severe psychiatric illnesses; he testified that despite the diagnoses in the record, none of Love's mental impairments were individually or collectively severe. (Tr. 645-46.) Upon questioning from Love's attorney, Dr. Tauber testified that a GAF of 60, which had been assigned to Love, indicated mild symptoms and signified that treatment was

5

not imminent or necessary. (Tr. 646-47.) The opinions from Dr. Porto, Love's treating psychiatrist, Dr. Lambert, and Dr. Tauber show that Love's mental impairments were not severe.

Finally, evidence regarding Love's activities and his own description of his mental health demonstrate that his mental impairments were not severe. Love underwent rehabilitation for his drug addiction at a residential rehabilitation center from October 11, 2004, to November 2, 2004. (Tr. 447.) According to a report from an intake counselor at the center, Love reported that symptoms related to his depression and other mental impairments were mild. (Tr. 488.) Further, counselors at the center reported that Love took an active role in chores and cooking and reported that he exhibited a good mood and good attitude and described him as having "excellent social interaction skills" with his peers and staff. (*See, e.g.,* Tr. 457, 463-64, 469, 472.)

Under the regulations, an impairment or combination of impairments is considered "severe" when it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c); 404.1521(a); *see also Stone*, 752 F.2d at 1101-02 (an impairment is not severe when it is a slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work). Basic work activities include the ability to understand, carry out, and remember simple instructions; using judgment; responding appropriately to supervisors, co-workers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b). There is substantial evidence in the record that Love's mental impairments

6

would not significantly limit or have more than a minimal effect on his ability to perform the foregoing functions.

Even in a case such as Love's in which the evidence indicates a mixed record concerning the claimant's diagnoses and attending limitations, it is the ALJ's responsibility to weigh the evidence; the court is then charged with determining whether there is substantial evidence in the record as a whole to support the ALJ's determination. *See Chambliss v. Massanari*, 269 F.3d 520, 523 (5th Cir. 2001) (citation omitted). In this case physicians diagnosed Love with a number of mental impairments. However, the evidence as a whole supports the ALJ's determination that Love's mental impairments were not severe.

### III.     The ALJ's Evaluation of Medical Opinion

"[T]he ALJ is entitled to determine the credibility of medical experts . . . and weigh their opinions accordingly." *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) (citations and internal quotations omitted). The ALJ's "power to judge and weigh evidence includes the power to disregard" such evidence and courts must uphold such a determination if supported by substantial evidence. *Id*. at 238. In regard to opinions offered by treating physicians, the ALJ may assign little or no weight to such opinions when good cause is shown. *Greenspan*, 38 F.3d at 237. Good cause is shown when it is determined that a physician's opinion is brief and conclusory, not supported by medically acceptable techniques, or otherwise unsupported by the evidence. *Id*. (citing *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985)). Further, the Social Security Rulings direct that the ALJ can assign controlling weight to a claimant's treating physician only when the following factors are met:

7

(1) the opinion is a "medical opinion"; (2) the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques; and (3) the opinion is not inconsistent with other substantial evidence in the claimant's record.  1996 WL 374188 at * 2.

Love contends the ALJ failed to properly evaluate medical opinions offered by a number of physicians, including Dr. Duriex, the physician who treated Love's HIV.  Love's arguments do not require remand.  The ALJ applied the appropriate standards and properly analyzed the medical opinions in the record, including those Love cites in his brief.  (Tr. 19-25.)  With specific regard to Love's argument regarding the ALJ's consideration of Dr. Duriex's opinions, he claims the ALJ discounted opinions offered by Dr. Duriex on grounds that the physician's records consistently indicated that Love's HIV disease was asymptomatic and that the ALJ failed to consider other assessments in Dr. Duriex's examination notes regarding his sleep disturbance, early satiety, neuropathy, malaise and fatigue, mental impairments, and his opinions in a residual functional capacity form completed at the request of his disability insurance carrier.

The ALJ considered all the evidence offered by Dr. Duriex, including that cited by Love.  (Tr. 19-23.)  He also acknowledged that Dr. Duriex completed a number of standardized forms on which he indicated Love could not work.  (Tr. 23.)  The record, in fact, contains four such assessments, three of which were completed by Kristy Astwood, R.N., and signed by Dr. Duriex. (Tr. 374-79, 519-22, 539-41, 543.)  Two of the assessments

were completed for Love's private insurance carrier[2] and the other two are standardized forms on which he was asked to give his opinion as to Love's functional capabilities. The ALJ declined to accord controlling weight to the opinions in these forms in part because he found that they were contradicted by Dr. Duriex's own treatment notes and were unsupported by clinical evidence in the record. (Tr. 23.) As the ALJ found, Dr. Duriex consistently indicated that Love's HIV was asymptomatic and that he did not suffer from objective manifestations of the disease. (*Id.*; Tr. 228, 230, 307, 315, 313-19, 322, 326, 333, 335, 530, 535.) The ALJ also found that Dr. Duriex's opinions on the disability forms were in direct contradiction with other evidence. The ALJ was correct. For example, Dr. Duriex indicated on two of the assessment forms that Love suffered from neuropathy; however, nerve conduction studies showed no evidence of generalized neuropathy. (Tr. 287-88.)

Dr. Duriex also indicated that Love experienced HIV wasting syndrome on one of the disability forms. (Tr. 376.) According to the disability form, wasting syndrome is characterized in part by involuntary weight loss of ten percent or more of the patient's baseline weight. *Id*. The ALJ acknowledged Dr. Duriex's report of wasting syndrome but found that the only evidence of "wasting" was documented in the record at a time when Love was abusing cocaine. (Tr. 22.) The record supports the ALJ's conclusion. (Tr. 228, 318-19, 335, 530, 535.) In addition, there is no evidence that Love was underweight or that he suffered a degree of weight loss indicative of wasting syndrome. The records indicate that

---

[2] The record shows that Love received disability insurance benefits through a private carrier. (Tr. 300.)

Love is 5 feet, 6 inches tall. (Tr. 148, 152.) According to Dr. Duriex's examination notes Love weighed 192 pounds on February 26, 2003, when he began treatment with Dr. Duriex, 202 pounds on December 1, 2004, and 189 pounds on April 20, 2005. (Tr. 248, 513, 530.) Thus, although Love experienced slight fluctuations in his weight, he did not experience "wasting" during the time period relevant to his claim.

Love also complains that the ALJ rejected Dr. Duriex's opinions that he suffered from debilitating mental impairments. Dr. Duriex indicated on one of the disability forms that Love was unable to perform certain work duties because of diagnoses of depression, obsessive-compulsive disorder, ADHD, and panic disorder. (Tr. 543.) In rejecting Dr. Duriex's opinions, the ALJ determined that Dr. Duriex was not qualified to give such opinions on grounds that he is not a mental health specialist and because he did not provide Love with psychiatric treatment. (Tr. 23.) Such factors are relevant to the ALJ's review of medical opinion. 20 C.F.R. §§ 404.1527(d), 416.927(d).

A review of the evidence shows that the opinions the ALJ rejected from Dr. Duriex were not supported by objective medical evidence and were inconsistent with his own records. Therefore, the ALJ not only had good cause to reject them, under Ruling 96-2p, it would have been impermissible for him to adopt them. 1996 WL 374188 at * 2 ("[i]t is error to give an opinion controlling weight . . . if it is not well-supported . . . or if it is inconsistent with the other substantial evidence in the case record.")

**IV.  The ALJ's Credibility Assessment**

Love claims the ALJ failed to assess the credibility of his testimony as required under

Social Security Ruling 96-7p. He claims medical opinions regarding the severity of his impairments are consistent with his testimony and argues that Ruling 96-7p requires the ALJ to consider the entire case record and give reasons for the weight he accords the claimant's testimony.

Under Ruling 96-7p the ALJ must assess the claimant's credibility by considering factors related to the claimant's daily activities, the frequency and intensity of the claimant's symptoms, and treatment the claimant receives. S.S.R. 96-7p WL 374186 at *3. The Ruling further requires that the ALJ's decision include findings that are "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id*. at *4. The ALJ must determine the truthfulness and reliability of the claimant's subjective allegations and "indicate the credibility choices made and the basis for those choices." *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1981).

The ALJ complied with the requirements of Ruling 96-7p; he addressed each of Love's allegations on an individual basis but found that they were not credible based in part on Love's daily activities and behavior during the administrative proceedings, the medical evidence, and Love's non-compliance with his HIV treatment and his drug abuse. (Tr. 27-28.) The ALJ was well founded in his conclusions and identified evidence in the record that supported his credibility determination. For example, he noted that the evidence showed that Love's HIV was consistently asymptomatic and that he had been repeatedly noncompliant with medical treatment, yet even during periods of noncompliance, his HIV

11

and psychological symptoms remained unchanged. (Tr. 27.) There is substantial support for the ALJ's conclusion. (Tr. 315, 318-19.) The ALJ also concluded that the medical evidence showed that a number of Love's complaints were caused by illegal drug abuse rather than a medically determinable impairment and that Love experienced many of the impairments he claimed were disabling for years before seeking disability and worked despite the impairments. (Tr. 28.) These conclusions are also supported by substantial evidence. (Tr. 28, 248, 439, 441, 604.)

The ALJ is not required to credit subjective complaints that are not substantiated by medical findings or that conflict with medical evidence. *See Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992). The ALJ complied with the requirements of Ruling 96-7p and articulated reasons for rejecting Love's allegations. Because there is substantial evidence to support his conclusion, it must stand.

## V.     Recommendation

Based on the foregoing discussion of the issues, evidence and the law, this court recommends that the United States District Court affirm the Commissioner's decision and dismiss Love's appeal with prejudice.

## VI.    Right to Object

Pursuant to 28 U.S.C. § 636(b)(1), any party has the right to serve and file written objections to the Report and Recommendation within ten days after being served with a copy of this document. The filing of objections is necessary to obtain de novo review by the United States District Court. A party's failure to file written objections within ten days shall

bar such a party, except upon grounds of plain error, from attacking on appeal the factual findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc).

    Dated:   October 26, 2006.

                                      NANCY M. KOENIG
                                      United States Magistrate Judge